## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ALKA JAUHARI,
    Plaintiff                      :

vs.                              :       C.A. NO.

SACRED HEART UNIVERSITY, INC.     :
    Defendant                 :       MAY 3, 2016

## <u>COMPLAINT</u>

### <u>INTRODUCTION</u>

1. This is an action for reinstatement, monetary damages, costs, attorney's fees, and other relief as a result of Defendant's discriminatory conduct undertaken against Plaintiff on the basis of her race, ethnicity and age in violation of federal and state law.

### <u>PARTIES</u>

2. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.* ("ADEA"), the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et. seq.* ("CFEPA"), and the common law of the State of Connecticut.

### <u>JURISDICTION</u>

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it presents a federal question under 42 U.S.C. § 2000e *et. seq.* and 29 U.S.C. § 621, *et. seq.*

4. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

5.  Plaintiff dual filed her claims with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and Equal Employment Opportunity Commission ("EEOC") on September 21, 2015.

6.  Plaintiff received a Release of Jurisdiction from the CHRO on or about March 8, 2016 and a Right to Sue letter from the EEOC on or about March 11, 2016.

**PARTIES**

7.  Plaintiff, Alka Jauhari, presently residing in Stamford, Connecticut, is a woman who was born in India on November 1, 1963 and was 51 years old on the date of the adverse employment actions referred to herein.

8.  Defendant, Sacred Heart University, Inc. is a private, non-stock corporation, governed by a Board of Trustees pursuant to the terms of its original charter.  Sacred Heart University, Inc. holds itself out to be a co-educational, independent, comprehensive institution of higher learning located at 5151 Park Avenue, Fairfield, Connecticut.  Defendant Sacred Heart University, Inc. is an employer within the meaning of, and subject to the provisions of, Title VII, ADEA and CFEPA.

**FACTS**

9.  Plaintiff began teaching at Sacred Heart University, Inc. in 1995.  After thirteen years teaching at Sacred Heart University, as an adjunct professor until 2008, and then as a Lecturer in 2008-2009, reappointed annually to the position, Defendant appointed Plaintiff to a probationary, tenure track position as Assistant Professor in the Department of Government & Politics in 2009 for the 2009-2010 academic year.

10. Subject to annual reappointment, the term of Plaintiff's tenure track was to be a period of six years at which point Defendant would determine whether Plaintiff satisfied

the criteria to be tenured, criteria that related to performance in the areas of teaching, scholarship, and service to the University.  In addition to being tenured, Plaintiff would be eligible to apply for promotion to Associate Professor at the time of the application for tenure.

11. Plaintiff applied for tenure and promotion in May of 2014 and was informed of the Defendant's denial of tenure and promotion by Defendant's President, John Petillo, on or about April 15, 2015, in a letter dated March 27, 2015.

12. At the time of the tenure and promotion decisions, Defendant determined that Plaintiff's performance in the areas of teaching and service met the standard for tenure and promotion, but denied tenure and promotions based upon the claim of insufficient scholarship.  Thus, Plaintiff's complaint highlights the facts and circumstance related to the research and scholarship criterion.

13. Prior to and during the twenty years of Plaintiff's employment at Sacred Heart University, Defendant formally adopted and then published documents governing the process for the tenure and promotion decisions and the criteria applicable to those decisions.

14. Plaintiff's employment as an Assistant Professor on tenure track was thus governed by documents published by Defendant, as well as oral and written communications between Plaintiff and Defendant, that served to define the terms and conditions of the employment agreement leading to the promotion and tenure decisions, including the procedures to be followed and the standards to be applied in making the decision as described in detail below.

15. Plaintiff reviewed and relied upon these communications and publications when adjusting her plans for academic research and publication of her scholarship, teaching, and service during the probationary period leading to the tenure and promotion decisions.

16. The documents referred to in paragraphs 13 through 15 include, but were not limited to, the procedures, policies, by-laws, regulations and guidelines set forth in the handbook referred to as *The Sacred Heart University Full Time Faculty Handbook* ("the Faculty Handbook"), as well as the *Constitution and By-Laws of the University Academic Assembly, as amended.*

17. The documents referred to in paragraphs 13 to 16 also include the letters of appointment sent to Plaintiff and letters of evaluation mandated by the Faculty Handbook and sent to the Plaintiff and to Defendant's Dean of the College of Arts & Sciences and to the Provost and Vice President of Academic Affairs ("Provost") by Plaintiff's department chair.  These appointment and evaluation letters created a standard against which Plaintiff's performance could legitimately be judged in accordance with established academic usage and custom, as well as the by-laws, policies and guidelines published by Defendant in the Faculty Handbook.

18. According to sections 3.13.1 and 3.13.2 in the Faculty Handbook, the probationary period, not to exceed six years, referred to as the "tenure-track," provides time for Plaintiff to demonstrate her ability to become tenured and promoted and also provides the Defendant with the opportunity to evaluate the Plaintiff on an annual basis in accordance with the procedures set forth in section 3.9 to determine if re-appointment

is appropriate. Such evaluations for re-appointment are made by the Provost in consultation with the College Dean and Department Chairperson.

19. As a probationary employee on tenure track, Plaintiff was issued annual letters of reappointment that permitted her to obtain tenure and promotion when she successfully met the requirements of the Faculty Handbook per section 3.4.2.

20. Defendant's annual reappointment of Plaintiff communicated to Plaintiff that she was performing consistent with the expectations for promotion and tenure and also advised Plaintiff on steps that Plaintiff should take to continue employment and obtain tenure and promotion.

21. Tenure is defined by the Faculty Handbook in section 3.13.1 to mean the right to receive continuous appointment until retirement, resignation or other reason for dismissal. Thus, upon the grant of tenure, a member of the faculty will be entitled to continuous letters of reappointment according to section 3.4.1 of the Faculty Handbook.

22. In all cases of tenure and promotion the "Statement of Principles: Academic Freedom and Tenure 1940" issued by the American Association of University Professors ("AAUP") ("the 1940 Statement') is the primary source of academic custom that governs the relationship between academic employers and their employees at the college and university level with respect to tenure decisions.

23. The 1940 Statement requires that the "precise terms and conditions" of the appointment, including the terms and conditions applicable to the tenure decision, should be in writing and communicated to the employee on tenure track and to the institution at the commencement of the tenure track appointment.

24. The 1940 Statement provides a standard against which the Defendant's conduct relating to the communication of the terms and conditions applicable to the appointment, tenure and promotion process is to be measured.

25. Plaintiff could reasonably expect that Defendant would abide by this principle in all communications and representations relating to the tenure and promotion decisions and act consistently with the information that was communicated to Plaintiff establishing criteria for the tenure decision.

26. According to the Faculty Handbook, at section 3.3.4, appointment at the rank of Assistant Professor presumes the following qualifications based on the criteria presented in section 3.9 listing performance and development standards: (a) demonstration of competence as a teacher and advisor of students, (b) evidence of ability for scholarship and research, (c) evidence of satisfactory performance in University responsibilities, (d) promotion of the mission and goals of Defendant, and (e) demonstration of ongoing professional development and contribution to the academic life of the faculty and University which may include direction of or significant participation in research projects, participation in scholarly activities of learned societies, professional consultative service and professional clinical activity.

27. At the time Plaintiff was appointed to Assistant Professor she met the requirements set forth in section 3.3.4 of the Faculty Handbook.

28. Promotion to the rank of Associate Professor requires a minimum of six years teaching experience as an Assistant Professor, with three of those years teaching at Sacred Heart University, and possession of the terminal degree in the candidate's field, per section 3.3.5 of the Faculty Handbook.

29. At the time that Plaintiff applied for promotion to Associate Professor she met the requirements of section 3.3.5 of the Faculty Handbook.

30. Candidates for promotion are required to excel in teaching, scholarship and professional development, and university and community service according to the Faculty Handbook in section 3.5.5.

31. Similarly, section 3.11.1 of the Faculty Handbook states that promotion and tenure reviews require a faculty member to demonstrate through past activities "the potential to make a continuing contribution to the University" based on review of performance in the three areas of teaching effectiveness, scholarly/creative activities, and university service.

32. Section 3.11.1 also states that when judging a candidate for promotion to Associate Professor or tenure, Defendant places "its highest priority" on teaching effectiveness which is given "foremost consideration in the promotion or tenure review," with scholarly/creative activities being "second in weight and consideration," and university service being "third in weight and consideration."

33. Excelling in scholarship is further defined by section 3.3.5.B.1 for individuals in Plaintiff's academic discipline to be based on evidence that includes books or monographs of scholarly research or creative writing; articles in recognized learned journals; and papers presented at academic or professional forums.

34. The Faculty Handbook sets forth an evaluation process that is a "means by which members of the teaching faculty can obtain constructive and balanced information which will enable them to fulfill their academic responsibilities and enhance their professional development" in section 3.9.  The assessment process is "also an

important means by which decisions are made regarding appointment, re-appointment, promotion [and] tenure."

35. The process of evaluation in section 3.9 calls for self-assessment, peer assessment, student assessment of teach and advising, annual assessment by the Department Chair, the College Dean, and the Provost with the results provided to the tenure track candidate and those mentioned above along with Committee on Rank and Tenure ("CRT") when appropriate.

36. Section 3.9 provides specific metrics that should be used to assess teaching, scholarship and creative work, service to the university, profession and student body.

37. With regard to scholarship and creative work, the Faculty Handbook, in section 3.9.2, makes clear that because research may vary from discipline to discipline, research should be evaluated in terms of its quality by reference to its level of recognition among peers and its significance to the particular discipline.

38. In addition to the definition of scholarship set forth in section 3.3.5.B.1, section 3.9.2 of the Faculty Handbook states that scholarly activity may include: (a) sustained inquiry in an area of one's discipline, (b) scholarly productivity demonstrated by presentation and publications, (c) application or nomination for research grants, and (d) sharing expertise with the University and external community.

39. According to section 3.9.2 of the Faculty Handbook, scholarship or creative work should be assessed by evidence generated in the following types of procedures or activities: (a) documented, self-report of activities, (b) evaluation or statements of professional peers, (c) "juried publications," (d) citation of research in other works, (e)

award of grants, prizes or commendations, and (f) demonstrated skill in methods of scholarship associated with one's discipline.

40. Throughout Plaintiff's employment until the decisions on tenure and promotion, Plaintiff presented the Chair of her Department and the Dean of the College of Arts & Sciences with information concerning her teaching, scholarship and service.

41. Throughout Plaintiff's employment until the decisions on tenure and promotion, Defendant reappointed Plaintiff to her position of Assistant Professor on tenure track after an annual evaluation process based on criteria in section 3.9 described herein.

42. When reappointing Plaintiff to her position of Assistant Professor, after a review of her performance on an annual basis, Defendant confirmed that Plaintiff met the criteria for continued appointment as an Assistant Professor, and Plaintiff relied upon the statements in the annual reviews of her performance to guide her in the tenure track process.

43. Between the date of her appointment on tenure track and the performance evaluation for the 2009-2010 academic year, Plaintiff attended two professional conferences where she presented papers and listed these conferences on her self-assessment as evidence of scholarship.

44. In the annual review of her performance for the 2009-2010 academic year signed by the Dean on April 7, 2010, the Chair of the Department rated Plaintiff "very good" in the area of scholarship based on the presentation of papers at cnferences, and the Dean commented positively on the fact that Plaintiff had presented at two conferences, noting that such presentations can be a prelude to submission of articles for publication in refereed journals, and then wrote, "I am glad to see that she expects to revise a

conference presentation this summer and submit it for consideration for publication. I urge her to get materials in the 'pipeline' for purposes of publication, for the years toward tenure go by quickly."

45. Plaintiff published her first article, "South Sudan: A Fledgling Nation" in the refereed journal *International Journal of Business and Social Sciences* in December 2010 and listed this publication in her self-assessment report to the Department Chair and the Dean for the 2010-2011 academic year.

46. Plaintiff also attended two conferences where she presented papers in 2010 and 2011.

47. In the annual review of her performance for the 2010-2011 academic year signed by the Dean on May 5, 2011, the Chair of the Department rated Plaintiff "excellent" in the area of scholarship, noting that 2010-2011 was a "breakout year" and "outstanding year" for Plaintiff in terms of scholarship. The Chair further stated that Plaintiff "published her very first refereed article in a reputable journal. This is a very important and commendable accomplishment." The Dean's review of scholarship stated, "Dr. Jauhari is producing as an active scholar."

48. Plaintiff published her second article, "Colonial and Post-Colonial Human Rights Record in Nigeria," in the refereed journal *International Journal of Humanities and Social Sciences* in May 2011.

49. Plaintiff published her third article, "Africa's Economic Resurgence: Is it Possible?," in the refereed journal *Africa Review* in June 2011 and listed this publication and attendance at conferences in her self-assessment report to the Department Chair and the Dean for the 2011-2012 academic year.

50. Plaintiff attended a conference where she presented a paper in April of 2012.

51. In the annual review of her performance for the 2011-2012 academic year signed by the Dean on April 30, 2012, the Chair of the Department rated Plaintiff "excellent" in the area of scholarship.  Referring to the publication in Africa Review, the Chair also stated, "Dr. Jauhari published a refereed article in a reputable journal during 2011-2012 AY.  I congratulate her on this accomplishment.  She is publishing in refereed journals with regularity which is impressive."  The Dean noted that Plaintiff had been given a third year review within the department and wrote, "The Dept. thought she was on track for tenure.  Her teaching & scholarship are solid. She is an outstanding colleague in the dept."

52. In addition to the annual reviews of her performance, Plaintiff participated in a Third Year Tenure Review process in the 2011-2012 academic year.  At that time, Plaintiff's teaching, scholarship and service were reviewed and no questions or concerns were raised about Plaintiff's scholarship at that time.  Plaintiff was advised by the members of her department and by the Dean of the College of Arts and Sciences to continue to perform in all three areas consistent with her past performance.  Plaintiff followed this advice.

53. Plaintiff published her fourth article, "India-Pakistan Relations: International Implications," in the refereed journal *Asian Social Science* and listed this publication and attendance at conferences in her self-assessment report to the Department Chair and the Dean for the 2012-2013 academic year.

54. Plaintiff attended two conferences where she presented papers in 2013.

55. In the annual review of her performance for the 2012-2013 academic year signed by the Dean on April 14, 2013, the Chair of the Department rated Plaintiff "excellent" in the area of scholarship. The Chair expanded on this rating by stating that Plaintiff had "published a peer reviewed article in a reputable journal and has plans to present a paper at a forthcoming political science conference. She has also attended a conference and has a potential article in progress. Her published article merits an Excellent rating. I am very impressed with Dr. Jauhari's commitment to professional scholarship. She is publishing articles with regularity in peer reviewed journals." The Dean wrote that Plaintiff had a "respectable year" without further commenting on Plaintiff's scholarship.

56. In the annual review of her performance for the 2013-2014 academic year signed by the Dean on April 21, 2014, just prior to the submission of Plaintiff's application for tenure in the fall of 2014, the Chair of the Department rated Plaintiff "very good" in the area of scholarship and the Dean wrote that Plaintiff's "plan for a book length manuscript of African politics seems very promising," without further commenting on Plaintiff's scholarship.

57. At no time during the probationary period and in the annual evaluation of her performance did the Defendant advise Plaintiff that she should not publish her work in particular journals.

58. At the time of tenure or promotion consideration, per section 3.11.1 of the Faculty Handbook, which lists "Promotion and Tenure Criteria," faculty members are expected to demonstrate and be able to document excellence in teaching, appropriate contributions in scholarly/creative activity, and service to the University. Contributions in

the area of scholarship should enhance the faculty member's professional development, make a contribution to the discipline, increase recognition of the Defendant as a center of knowledge or culture in the community of interest or at large, and/or contribute to the "treasury of human knowledge."

59. Section 3.11.1 of the Faculty Handbook also states that faculty members are also expected to demonstrate cumulative accomplishments and Defendant shall include as a component of the review whether the faculty member met expectations in the three areas of performance as "agreed upon and documented on an annual basis by the faculty member and appropriate Department Chairperson," with the assumption that such annual goals and expectations were established each year with consideration of the need to demonstrate development appropriate to the next level of review by the CRT.

60. According to section 3.11.3.B of the Faculty Handbook, in the area of scholarly and creative activity, the Defendant's "expectations for such activities shall be consistent with reasonable University support and with documented annual goals and expectations agreed upon by the faculty member and the appropriate Chairperson."

61. Plaintiff's annual performance evaluations not only demonstrated that she met expectation for appointment but that she had met annual goals and expectations that were established with consideration of the need to demonstrate development appropriate to the next level of review by the CRT and agreed upon between Plaintiff and the Chair of her department.

62. Section 3.11.3.B.1 of the Faculty Handbook further defines scholarship and research and then ranks the types of documentation in order of importance.  Thus,

"scholarship" is defined as activity which updates or extends an area of study within the professional life of the faculty member including the development and sharing of ideas, participation in conferences, conventions, workshops, professional meetings, and the publication of articles and monographs.  Research is defined as activity carried out with the deliberate intent of extending the frontiers of knowledge in a discipline or solving a specific problem.

63. Plaintiff engaged in scholarship and research as defined by section 3.11.3.B.1 of the Faculty Handbook through her development and sharing of ideas regarding political science in Africa and Asia through publication and presentation of papers throughout her time on tenure track.

64. As set forth in section 3.11.3.B.1 of the Faculty Handbook, documentation of scholarship and research beyond self-assessment may include (listed in order of importance in each category): (a) publications in refereed journals, invited publications, and non-refereed publications; (b) refereed presentations, invited presentation and non-refereed presentations; and (c) additional sources of documentation such as appointment to state or national post in a scholarly capacity, collaboration in ongoing scholarship or research, development of new and creative instructional materials, attendance and participation in academic or professional forums, grants, manuscript reviewer or Editorial Board member, published citations of work, and scholarship or research in progress.

65. Plaintiff documented her scholarship by publication in refereed journals, invited publications, refereed presentations and the submission of grant applications throughout her time on tenure track.

66. The Faculty Handbook provides in section 3.1.1 that tenure shall be granted in accordance with the rank and tenure process, University policy and a vote of the Board of Trustees.

67. The Faculty Handbook sets forth the procedures and policies for promotion in section 3.12 and the procedures and policies for tenure in section 3.13. The review process and timelines for both the promotion and tenure decisions are identical, with one exception. For both promotion and tenure, the faculty member submits the "candidate's portfolio" to the Department Chair, the CRT solicits evaluations from the appropriate faculty and students, the Chair and the faculty in the relevant department submit their evaluations to the CRT, the candidate's portfolio is then transferred to the Dean who also submits a written recommendation on the candidate along with the candidate's portfolio to the CRT, the CRT then reviews the file and submits its recommendation to the Provost who submits his recommendation to the President. In the case of promotion, the President makes the promotion decision; however, in the case of tenure, the President makes his recommendation to the Academic Affairs Committee of the Board of Trustees which in turn submits its final recommendation to the Board for a full vote.

68. According to section 3.12 and 3.13 of the Faculty Handbook, a candidate indicates an intention in May to be considered in the following academic year. The process of submitting the candidate portfolio begins in September at the beginning of an academic years and ends with a decision by the President and the Board in March of the following year.

69. Both sections 3.12.2.1 and 3.13.2.1 of the Faculty Handbook state that "Faculty are reviewed and recommended for [promotion or tenure] on the basis of fulfillment of the eligibility requirements."

70. According to section 3.12.1 of the Faculty Handbook, a faculty member is deemed to be eligible for promotion if the evidence demonstrates "outstanding teaching effectiveness; evidence of noteworthy research, creative or professional activities; and evidence of outstanding service to the University community.  Such evidence will provided in part by periodic/annual performance reviews."

71. Eligibility for tenure, as per section 3.13.2 of the Faculty Handbook, assumes the candidate possesses appropriate academic credentials which are agreed upon at the time of a department seeks approval for the continuation of a position or the creation of a new position.  Otherwise, no additional criteria are set forth in this section beyond the necessity of a request to be considered for tenure in the sixth year of the probationary period.

72. Section 3.12.2.1 and section 3.13.2.1 of the Faculty Handbook then set forth in detail the content of the promotion and tenure review files which are identical.  In each case the review file is in two parts: the faculty or candidate portfolio prepared by the faculty member and the material solicited by the CRT.  The candidate's portfolio contains materials documenting the teaching, scholarship and service assembled by the faculty member along with letters of support solicited by the candidate.  The materials solicited by the CRT include the recommendations of the Dean, the Chair, faculty members in the department and from students.  The CRT is also permitted to consult with outside experts.

73. In both sections 3.12.2.2 and 3.13.3.2 of the Faculty Handbook, the Department Chair shall review the file and evaluate the "degree to which the candidate meets the appropriate criteria" and also "assess the ability of the candidate to serve the educational needs of the department in both the near and long-term future."

74. In both sections 3.12.2.3 and 3.13.3.3 of the Faculty Handbook, the College Dean shall review the file and evaluate the "degree to which the candidate meets the appropriate criteria" and also "assess the ability of the candidate to serve the educational needs of the department in both the near and long-term future."

75. In both sections 3.12.2.4 and 3.13.3.4 of the Faculty Handbook, the tenure members of the appropriate faculty department are required to provide an evaluation in the form of a response to a questionnaire sent to the faculty member by the CRT.

76. Thereafter, the CRT is required to provide a recommendation once the file is complete.  In both section 3.12.2.1 and section 3.13.2.1 of the Faculty Handbook, the "evaluation of the Committee on Rank and Tenure will be based on the evidence contained in the [promotion or tenure] review file" which includes the recommendations from the relevant faculty, the Department Chair, and the Dean as well as materials submitted by the candidate.

77. In section 3.12.2.5 of the Faculty Handbook, a recommendation on promotion is based on a judgment by the CRT on "whether the individual meets the criteria established above."

78. In section 3.13.3.5 of the Faculty Handbook, upon completion of the tenure review file, the CRT will "determine the degree to which each candidate has successfully or unsuccessfully met the various criteria."

79. On or about September 15, 2014, Plaintiff submitted her candidate portfolio and application for tenure and promotion, including all supporting materials in accordance with Defendant's requirements.

80. On the research and scholarship criterion, Plaintiff's application demonstrated that from the date of her appointment in the Fall of 2009 through the September 2014 when the application for tenure and promotion were submitted, Plaintiff engaged in a continuous process of research, writing, presentation of papers at conferences, grant application, and publication such that by the time of her tenure application, Plaintiff had published four articles in peer-reviewed journals and had presented papers at eight peer-reviewed and invited national and regional conferences in her discipline.  In addition, a fifth article abstract had been accepted for inclusion in an edited book volume with the manuscript due to the editors on September 30, 2014.

81. As further evidence to demonstrate the prominence and recognition of her research and scholarly publications, Plaintiff provided evidence of the high number of occasions her articles had been downloaded nationally and internationally, one of the best in her discipline.

82. In addition, Plaintiff demonstrated the significance of her work by noting that a Chinese student from the China University of Geosciences in Wuhan, China, had asked Plaintiff to be a thesis advisor after reviewing one of the peer-reviewed articles reviewing "*India-Pakistan Relations –International Implications*," which was published in Asian Social Science.  This same article also prompted two peer-reviewed journals to write to Plaintiff to invite her to submit articles for publication in the future.

83. As additional evidence of her scholarship and prominence in her field Plaintiff submitted a letter from Frank Michello, Professor of Finance at Jones College of Business, Middle Tennessee State University as an external reviewer in support of Plaintiff's application for tenure dated September 10, 2014.  Plaintiff had met Professor Michello at a conference and he asked Plaintiff if he could review the full paper she presented.

84. In his September 10, 2014 letter, Professor Michello reviewed Plaintiff's scholarship and commented specifically on the four peer-reviewed articles.  Professor Michello stated Plaintiff "has conducted fascinating research over the last eight years, particularly in the areas of economic development, globalization, human rights, and international relations."

85. In his September 10, 2014 letter, Professor Michello provided the following expert opinion on Plaintiff's peer-reviewed articles, "She has published four articles on topics that have been well received and have made a significant impact on our understanding of the challenges facing Sub-Saharan and the India-Pakistan conflict."

86. Professor Steve Lilley, Chair of the Department of Sociology at Defendant, and Professor James Castonguay, Chair of the Department of Media Studies at Defendant, also submitted letters of recommendation in favor of Plaintiff as internal evaluators.

87. On or before September 30, 2014, Department Chairman, Gary Rose, forwarded Plaintiff's candidate's portfolio to the Dean of the College of Arts & Sciences, Robin Cautin, and submitted his evaluation to the CRT.  The two other other members of the faculty in the Department of Government, Politics & Global Studies also submitted their faculty evaluations to the CRT.

88. Plaintiff's Department Chair Rose positively recommended Plaintiff for tenure and promotion.

89. On or before October 21, 2014, Dean Cautin forwarded Plaintiff's candidate portfolio along with a written recommendation to the CRT.

90. Although its recommendation was due on or about December 21, 2014, the CRT voted 6-1 *against* a positive recommendation in January of 2015, and submitted its recommendation to Provost Laura Niesen de Abruna in that month.

91. In denying Plaintiff a positive recommendation, the CRT judged Plaintiff's teaching to be excellent and her service as adequate for tenure.  However, the CRT stated Plaintiff's scholarship was "weak and insufficient to merit this promotion."

92. In support of the negative evaluations of Plaintiff's scholarship, the CRT stated that Plaintiff had presented at several regional and national conferences and had "published four supposedly 'peer reviewed' articles.  But three of these articles are in journals of dubious quality that are not respected in the scholarly community."

93. In making this claim regarding the dubious quality of the journals and the alleged lack of respect in the scholarly community, the CRT created a standard for recognition of the journals that does not appear in the Faculty Handbook and that had never been communicated to Plaintiff during the entire time she was on tenure track.  Furthermore, by simply focusing on the alleged reputation of the journal, the CRT did evaluate the quality of underlying articles which were peer reviewed by the journals, by the Department Chair and by the external reviewer Professor Michello.

94. The Faculty Handbook's reference to scholarship as a component of the attributes for promotion to Associate Professor in section 3.3.5 speaks to "active

scholarship as evidenced by … articles in recognized learned journals…" without further elaboration.

95. Section 3.9.2 of the Faculty Handbook, dealing with the evaluation process, refers to "juried publications" as being one source of evaluation, but does not define the term "juried publication" to mean any particular journal or list of journals.

96. Section 3.11 of the Faculty Handbook, referring to the Criteria for Tenure and Promotion, makes clear that "scholarship" is activity which updates or extends an area of study within the professional life of the faculty member including the development and sharing of ideas, participation in conferences, conventions, workshops, professional meetings, and the publication of articles and monographs. Other than ranking the various types of publications as refereed, invited, and non-refereed, the Faculty Handbook does not dictate where the scholarship may be published.

97. The CRT also stated that the publisher of the journal that published one of Plaintiff's articles and the journal itself were mentioned in an article published on the Internet and were placed on a "list of predatory journals."

98. The CRT's referred to the Faculty Handbook's reference to "recognized learned journals" in section 3.3.5, and the lack of definition specifying what a "recognized learned journal" is meant to be as being the basis for the dissenting vote in the CRT, but the majority of the CRT rejected this position because "information about the poor reputation of the three journals in question [was] easily available on the Internet and that therefore it is the applicant's responsibility to avoid such publications." The CRT did not identify the third journal it questioned.

99. In making the claim that the journal and publisher were on a list of predatory journals, the CRT was relying upon two pieces of information that were not included in Plaintiff's candidate's portfolio: a list generated by Jeffrey Beall, an Associate Professor and librarian at the University of Colorado, Denver, referred to as "Beall's List," and an article published in August of 2012 in *"Times Higher Education,"* a magazine based in London that publishes articles regarding higher education.

100.    Beall's List never listed either of the journals to which Plaintiff submitted her first two publications.  In addition, the publisher of the *International Journal of Business and Social Sciences* and of the *International Journal of Business and Social Sciences,* "Center for Promoting Ideas," did not appear on Beall's list until 2012.

101.    In fact, both the Beall's List making reference to the Center for Promoting Ideas as a predatory publisher, and the article in *Times Higher Education* making reference to the Center for Promoting Ideas were published *after* Plaintiff had published her first two articles in the *International Journal of Business and Social Sciences* in December of 2010 and in the *International Journal of Business and Social Sciences* in May of 2011.

102.    Thus, in the recommendation denying tenure and promotion, the CRT falsely claimed that "information about the poor reputation of the three journals in question [was] easily available on the Internet…"

103.    Although Plaintiff attended meetings related to the tenure review in April 2013 and April 2014 that were attended by CRT members, including the Chair of the CRT in the year Plaintiff's case was before the CRT, no mention was made of "Beall's List" or of concerns related to publishing in Open Access journals as listed in the *Times*

*Higher Education* article, despite the fact that the article was published in August of 2012 and readily available to the members of the CRT at the time of the meetings concerning tenure review.

104.     Plaintiff was unaware of the so-called "Beall's List" until it was mentioned in the CRT's negative recommendation.

105.     The CRT also stated that one of the publishers charged a $200 fee to complete a two-week turnaround time for peer review of articles submitted to that journal.

106.     In making this claim regarding the payment of a fee, the CRT was not relying upon evidence in the candidate's file, but was incorporating information from an article the CRT found on the Internet that mentioned payment of a $200 fee. Although some Open Access journals will publish without a fee, it is not unusual for Open Access journals to charge a fee for publication since the journals are subscription based. However, there was no evidence in the file to support the claim that a fee was paid "to complete a two week turnaround for peer reviewed articles."

107.     In fact, prior to submission of her articles in all cases, Plaintiff made sure the journals were peer-reviewed. Plaintiff also checked the identity of individuals who were on the publication's editorial board and found individuals listed there from renowned universities in the United States. After Plaintiff's article was accepted for publication, Plaintiff was invoiced for a $100 to $200 processing fee which Plaintiff assumed was used to defray administrative costs similar to a registration fee paid to attend a conference in order to present a paper.

108.     Well known and respected publishers that are not listed on Beall's List also charge fees for publication in Open Access journals and so payment of a processing fee does not in and of itself signal a journal of "dubious reputation."

109.     Shortly after Plaintiff submitted her article to Asian Social Sciences she received a solicitation from Sage Publications, a well-known academic publisher with 1500 employees and offices in Los Angeles, London, New Delhi, Singapore and Washington, D.C., publishing over 940 journals.

110.     Sage Publications solicited Plaintiff to submit articles to its relevant journal at the time Plaintiff was seeking to publish the article that was ultimately published in Asian Social Sciences.

111.     Sage Publications is one of the founders of the "Open Access Scholarly Publishers Association," an organization whose purpose is to support and represent the interests of journal and book publishers in the open access movement that developed in conjunction with access to the Internet.

112.     Sage Publications charges an "article processing charge" for its "SAGE OPEN" program in the amount of $395, and an article processing charge between $750 and $3,000 for its "SAGE CHOICE" program.

113.     Sage Publications states the following with regard to the fee charged to publish on line.  "Although the publication is open access, there are still costs at every stage of the publication process, including but not limited to peer-review, copyediting and typesetting, as well as hosting the article on dedicated servers. These expenses are recovered by charging the author an article processing charge (APC) upon acceptance of their manuscript. Many institutions and organizations are now factoring

open access acceptance fees into their research budgets and grants. The current APC price is $395."

114.     Another founding member of the Open Access Scholarly Publishers Association, a nonprofit organization known as the Public Library of Science ("PLOS"), a publisher that also does not appear on Beall's List, also charges article processing fees ranging from $1495 to $2995 following the acceptance of peer reviewed articles. PLOS's website states it has published the work of 56 Nobel Laureates since 2001.

115.     Because Plaintiff's article had already been accepted by Asian Social Sciences she did not submit it to Sage Publications.

116.     The CRT also criticized two of the articles submitted as being "very short" compared to the norm in her field, with content that summarized the work of other rather than presenting original research."

117.     In making this claim the Plaintiff's articles were "very short," the CRT created a standard for the "norm" in Plaintiff's field, when no such standard exists, and there was no evidence in Plaintiff's portfolio to support this claim.  It is routinely the case that editors in Plaintiff's field seek articles with limited word counts.

118.     In addition, Plaintiff's scholarship is not required to be based on original research under the definitions of scholarship set forth in the Faculty Handbook so long as Plaintiff is advancing the knowledge in her discipline.

119.     Thus, the CRT was holding Plaintiff to a scholarship standard that was created solely to apply to Plaintiff's case for tenure.

120.     The CRT also claimed that Plaintiff's work was "rarely cited by others," and so her scholarship did not increase recognition of the university as a center of knowledge or culture in the field of political science.

121.     In making this claim the CRT ignored the peer-reviewed article published in *Africa Review,* a Taylor & Francis/Routledge Group publication, one of 2,400 journals published by a global, academic publisher based in the United Kingdom since 1852 with 18 offices and 1,800 employees worldwide.

122.     CRT also ignored the evidence that the article Plaintiff published in *Asian Social Science* was identified by Digital Commons at Sacred Heart University as having the second highest downloads among articles published by Defendant's faculty members.

123.     Plaintiff's article on Nigeria, "Colonial and Post-Colonial Human Rights Record in Nigeria," published in the refereed journal *International Journal of Humanities and Social Sciences* in May 2011, had the highest downloads for articles published by Defendant's faculty members in the Arts and Humanities Commons as of 2016, and Plaintiff was identified as the most popular author African Studies Common, the national digital network for African Studies.

124.     In denying a positive recommendation for tenure and promotion based on scholarship the CRT failed to account for the opinion of Department Chair Gary Rose, Professor Michello, and other letters supporting Plaintiff's scholarship.

125.     Provost Niesen de Abruna then forwarded her recommendation on or about January 24, 2015 to President Petillo.

126.     President Petillo forwarded his recommendation to the Academic Affairs Committee on Board on or about February 1, 2015.

127.     Thereafter, on March 27, 2015, Defendant's Board of Trustees failed to approve Plaintiff as a candidate for tenure and President Petillo denied Plaintiff promotion to Associate Professor.

128.     Plaintiff was informed of this decision by letter from Defendant's President, John Petillo on or about April 15, 2015, in a letter dated March 27, 2015.

129.     Subsequent to the denial of tenure, Plaintiff filed a grievance under section 3.15 of the Faculty Handbook on April 11, 2015.

130.     The Grievance Committee held hearings and issued a ruling on July 6. 2015 stating the "process the CRT used to evaluate [Plaintiff's] scholarship was unfair" because it placed undue emphasis on publishing in two journals that the CRT found objectionable because they were listed by Beall when, in fact, Plaintiff published these articles before the journals appeared on Beall's list.  The Grievance Committee also pointed out that the Faculty Handbook is weighed second to teaching for tenure according to section 3.11.1

131.     The Grievance Committee later decided that it did not have jurisdiction over the grievance in a letter dated June 27, 2015 in response to a letter from President Petillo dated July 13, 2015.

132.     Thereafter, Plaintiff sent additional information by way of a letter to the Defendant's President John Petillo on July 29, 2015 setting forth how the CRT had evaluated her candidacy in violation of Defendant's written procedures and with a bias against the Plaintiff.

133.    President Petillo did not respond to Plaintiff's letter.

134.    Plaintiff has thus exhausted her internal, administrative remedies.

135.    According to the Answer to paragraph nine of Plaintiff's complaint to the CHRO, the CRT's negative recommendation was relied upon to deny Plaintiff tenure and promotion.  The CRT's negative recommendation for the reasons stated also influenced the recommendation of the Provost and President and was ultimately adopted by the Defendant's Board of Trustees as the reason for denial of tenure and promotion to Plaintiff.

136.    As indicated by paragraphs 149 to 160, the facts of which are incorporated by reference, the CRT recommended tenure in the case of another faculty member in the same year that Plaintiff was reviewed and that faculty members sole publications consisted of two articles published by a publisher that was listed on Beall's List prior to the publication and tenure decision.

**COUNT ONE:       BREACH OF CONTRACT INCLUDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

137.    Defendant has breached the employment agreement, including the implied covenant of good faith and fair dealing, when contrary to Plaintiff's reasonable expectations, the CRT created a standard of measuring scholarship that was not mentioned in the Faculty Handbook.  The tenure and promotion process and standards set forth in the Faculty Handbook describe the activity of scholarship and research in great detail, along with the manner and metrics that would be used to objectively measure the product of scholarship, which in this case consist of scholarly articles created from Plaintiff's inquiry into her field.  The criteria for tenure and promotion published by Defendant required a judgment based on the evidence in the file

compared to the standard in the Faculty Handbook; however the CRT ignored the evidence of scholarship in the file and based its decision on a standard not set forth in the Faculty Handbook when it dismissed Plaintiff's articles based solely on the identity of the publisher and/or the journal.

138.    Defendant breached the employment agreement, including the implied covenant of good faith and fair dealing, when contrary to Plaintiff's reasonable expectations, and the standards, policies and procedures applicable for the tenure decision, the CRT the failed to reach a decision based upon the evidence in the file focusing on the quality of Plaintiff's scholarship, but rather based the decision solely upon the "dubious reputation" of three of the four publications and disregarded the other evidence of scholarship, including the expert opinion from members of Plaintiff's discipline and external experts.   Because the CRT applied a standard to judge Plaintiff's scholarship which was based solely on the reputation of the journal, a standard that is not provided for in the Faculty Handbook but one that is made up to as a way to deny Plaintiff tenure in this particular case, Defendant's decision shows application of a standard that is not fixed in the specific terms and conditions communicated at the commencement of the tenure track process or at any time in the evaluations so as to be an arbitrary and capricious decision.  The decision of the CRT was also arbitrary and capricious because publication in journals of "dubious reputation" did not prevent other faculty members from obtaining tenure in the same year Plaintiff was denied tenure.

139.    Defendant also breached the employment agreement, including the implied covenant of good faith and fair dealings, and contrary to Plaintiff's reasonable

expectations, the publications which the CRT found disqualifying in the tenure decision-making process were all listed in annual reports of Plaintiff's development as a scholar in the evaluation process for Assistant Professor. Plaintiff's publications began in 2010 and ended in 2013 at the time of tenure with two of the three so called predatory publications occurring in 2010 and 2011 with the specific publisher listed in the CRT recommendation. Contrary to Plaintiff's reasonable expectations based on section 3.9 of the Faculty Handbook and communications made to Plaintiff throughout her tenure track, at no time, including at the Mid-Tenure Review process, was Plaintiff advised by her Department Chair, Dean of the College or Provost that publication in the journals Plaintiff listed on Beall's List would disqualify her for tenure consideration because these journals would be considered of "dubious reputation."

140.    As a result of Defendant's denial of tenure to Plaintiff, Plaintiff was appointed to a terminal year of employment with Defendant with an end date of June – 2016. Had tenure been granted, Defendant would have been obligated to continue to offer Plaintiff employment until retirement.

141.    As a result of Defendant's breach of contract, Plaintiff has and will suffer damages in the form of loss of benefits, loss of wages, and a diminishment of her opportunity to earn wages in the future.

**COUNT TWO:    DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000e *et seq*.**

1-141    Paragraphs 1 through 141 of Count One are hereby incorporated by reference and made paragraphs 1 through 141 of Count Two as though more fully set forth herein.

142.    The foregoing actions on the part of the Defendant were substantially motivated by Plaintiff's race, national origin, color, gender and/or age.

143.    During the 2014-2015 academic year, ten candidates were considered for tenure by Defendant.

144.    During the 2014-2015 academic year, five tenure candidates were white women, two tenure candidates were women of color, two tenure candidate were white males, and one candidate was a black male.

145.    During the 2014-2015 academic year, three candidates for tenure were denied tenure by the Defendant.

146.    During the 2014-2015 academic year, all three candidates denied tenure were women.

147.    During the 2014-2015 academic year, two of the candidates denied tenure, Plaintiff and Stephane Jasmin Kirven, a member of the Department of Criminal Justice, were women of color.

148.    During the 2014-2015 academic year, several of the seven candidates who were granted tenure in 2014-2015 were substantially younger than Plaintiff.

149.    In addition, at the same time the CRT, the Provost, President and Board of Trustees denied tenure to Plaintiff, despite her excellent teaching, based the claim that Plaintiff's  scholarship was weak and insufficient because three of Plaintiff's four refereed journal articles were published by publishers cited by Beall's list, Defendant granted tenure to Assistant Professor Patrick Morris, a white male faculty member who was a candidate for tenure in 2014-2015 and was granted under circumstances suggesting disparate treatment.

150.     The publisher known as Academic and Business Research Institute ("ABRI") is a for profit publisher located in Jacksonville, Florida.

151.     ABRI derives all of its revenue from author fees and its website states that not all institutions recognize for–profit or author pay publications for tenure and promotion.

152.     ABRI publishes the *Journal of Criminal Justice and Legal Issues.*

153.     ABRI appeared on Beall's List as a predatory publisher on December 4, 2012 and January 2, 2014.

154.     ABRI charges a "review fee" of $45 for articles under 20 pages and $95 for articles longer than 20 pages.

155.     ABRI charges a "web publishing fee" of $195 for articles that 10 pages or less, $255 for articles between 11 and 20 pages, and $395 for articles between 21 and 40 pages.  For an additional $100, the author can obtain two copies of the printed journal sent to the same address.

156.     ARBI also charges an option editorial fee of $25 per page.

157.     Members of the Defendant's Department of Criminal Justice, including professors James E. McCabe, Patrick Morris, and Tracy Grant were published in the *Journal of Criminal Justice and Legal Issues* in July and September of 2014.

158.     Defendant's Department of Criminal Justice pays the fees to publish articles in Open Access journals on behalf of the members of its department.

159.     Assistant Professor Patrick Morris published two articles in the *Journal of Criminal Justice and Legal Issues,* one in July of 2014 and the other in September of

2014, and both of these publications were listed as scholarship on his tenure and promotion application in the 2014-2015 academic year.

160.     Defendant granted tenure and promotion to Assistant Professor Morris in 2014-2015 despite the fact that both of the articles listed on his tenure and promotion application were published in a journal of "dubious reputation" based on its inclusion on Beall's List.

161.     In addition, Assistant Professor Morris had only one conference presentation listed on his CV, as opposed to the eight conference presentations that Plaintiff delivered following her appointment as an Assistant Professor.

162.     Based on the foregoing, Defendant discriminated against Plaintiff on the basis of her color, race and ethnicity in the terms and conditions of her employment, including the denial of tenure and promotion, resulting in the termination of Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*

163.     As a result of Defendant's conduct Plaintiff suffered anxiety, grief, physical pain, a loss of appetite, interference with her sleep and disruption in her professional and personal life.

164.     Defendant's actions were intentional in that they were willful, wanton, and taken with reckless disregard of Plaintiff's rights.

165.     As a result of Defendant's discriminatory actions, Plaintiff has suffered damages, including, but not limited to, economic and non-economic damages in the form of loss of wages and benefits, emotional distress, physical pain, loss of enjoyment of life and profession, destruction of her academic career, and harm to reputation.

166.     As a further result of Defendant's discriminatory conduct, Plaintiff has incurred, and will continue to incur, attorney's fees and costs.

**COUNT THREE:    DISCRIMINATION IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT, CONN. GEN. STAT. § 46a-60 et. seq.**

1-166     Paragraphs 1 through 166 of Count Two are hereby incorporated by reference and made paragraphs 1 through 166 of Count Three as though more fully set forth herein.

167.     Based on the foregoing, Defendant discriminated against Plaintiff on the basis of age, color, race and ethnicity in the terms and conditions of her employment, including the denial of tenure and promotion, resulting in the termination of Plaintiff's employment, in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 et. seq.

**COUNT FOUR:     DISCRIMINATION IN VIOLATION OF AGE DISCIMINATION IN EMPLOYMENT ACT OF 1967 29 U.S.C. § 621 et seq.**

1-161     Paragraphs 1 through 161 of Count Two are hereby incorporated by reference and made paragraphs 1 through 161 of Count Four as though more fully set forth herein.

162.     Based on the foregoing, Defendant discriminated against Plaintiff on the basis of age in the terms and conditions of her employment, including the denial of tenure and promotion, resulting in the termination of Plaintiff's employment, in violation of the ADEA, 29 U.S.C. § 626

**COUNT FIVE:     NEGLIGENT MISREPTRESENTATION**

1-131     Paragraphs 1 through 131 of Count One are hereby incorporated by reference and made paragraphs 1 through 131 of Count Five as though more fully set forth herein.

132.     Defendant failed to exercise due care in obtaining and communicating information regarding the standards and procedures applicable to the tenure decision relied upon by Plaintiff in making decisions regarding her scholarship, as indicated by the Defendant's failure to honor Plaintiff's reasonable expectations regarding the performance of the employment agreement, and as a result Plaintiff pursued a path of publishing her scholarship and engaged in other scholarly activities as described in the Faculty Handbook

133.     As a result of Defendant's negligent misrepresentation, Plaintiff suffered economic harm as indicated and non-economic damages in the form of emotional distress, loss of enjoyment of life and harm to reputation resulting from the denial of tenure and promotion.

**DEMAND FOR RELIEF**

**WHEREFORE**, the plaintiff demands a TRIAL BY JURY and judgment against the Defendant as follows:

1.  An order reinstating the plaintiff to a position as Associate Professor of Political Science with tenure and awarding her the salary and benefits she would have received had she been granted promotion and tenure in 2015 together with interest;

2.  Economic damages including lost wages and benefits;

3.  Non-economic damages, but not limited to, damages for emotional distress, pain, humiliation and embarrassment, loss of enjoyment of life, loss of enjoyment of profession, and harm to reputation;

4. Punitive damages pursuant to 42 U.S.C. § 1981a and Connecticut General Statutes § 46a-104 as "legal relief";

5. Liquidated damages pursuant to 29 U.S.C. § 626(b);

6. Interest;

7. Attorney's fees and litigation costs, 42 U.S.C. § 2000e-5, 29 U.S.C. § 626(b), 42 U.S.C. § 1988, and Connecticut General Statutes § 46a-104;

8. Such other further monetary or injunctive relief as this Court deems necessary and proper.

Dated at New London, Connecticut this 3rd day of May, 2016.

PLAINTIFF
ALKA JAUHARI

By: _____
Jacques J. Parenteau (ct09771)
Madsen Prestley & Parenteau, LLC
105 Huntington Street
New London, CT 06320
Tel: (860) 442-2466
Fax: (860) 447-9206
Email: jparenteau@mppjustice.com